Present: All the Justices

GINA L. SCHAECHER, ET AL.

v.  Record No. 141480

ROBINA RICH BOUFFAULT

OPINION BY
JUSTICE LEROY F. MILLETTE, JR.
June 4, 2015

FROM THE CIRCUIT COURT OF CLARKE COUNTY
John E. Wetsel, Jr., Judge

In this appeal we consider (1) whether any of nine statements by the defendant are sufficiently defamatory in nature to survive demurrer, and (2) whether the allegations state a claim for tortious interference with contract.

I.    FACTS AND PROCEEDINGS

This appeal arises from circumstances surrounding a special use permit application regarding a prospective property for 3 Dog Farm, LC, a company that provides rehabilitation services to displaced companion canines.  Plaintiff Gina Schaecher owns both 3 Dog Farm and plaintiff Happy Tails Development, LLC ("Happy Tails"), the contract purchaser of the Clarke County property on which Schaecher intended to locate 3 Dog Farm.  In accordance with Clarke County Zoning Ordinances, Happy Tails applied for a special use permit on August 6, 2013, requesting a permit to operate a boarding kennel of more than five canine animals.

Plaintiffs allege that defendant Robina R. Bouffault, a nearby neighbor and member of the Clarke County Planning

Commission ("Planning Commission"), sent defamatory emails and made false public statements defaming Schaecher and Happy Tails. The allegations include two counts of defamation, one on behalf of Schaecher and one on behalf of Happy Tails, and one count of tortious interference with contractual relations on behalf of Happy Tails.[1]

The circuit court sustained Bouffault's initial demurrer, granting plaintiffs leave to amend. The amended complaint includes nine alleged defamatory statements. Eight of these statements were sent in email form to some or all members of the Planning Commission and other interested parties, and are attached as exhibits to the amended complaint.[2] One of the alleged defamatory statements was made to a local newspaper, The Winchester Star, and is not attached as an exhibit.

Five of the emails and The Winchester Star comments concern whether the kennel as proposed would comply with conservation easements, private covenants, or county

_____

[1] Because these counts are pled separately, and because defamation against an individual is not necessarily defamation against her business and vice versa, Schaecher and Happy Tails will be referred to in this opinion as individual parties or collectively as "plaintiffs," as appropriate.

[2] While it is not specifically pled that the recipients were members of the Planning Commission, the context of the emails makes this clear. In particular, Brandon Stidham, whose email signature identifies him as the Director of Planning, is a recipient of every email, and Bob Mitchell, identified by Bouffault in an email as the County Attorney, is a recipient of several emails.

ordinances.  Plaintiffs allege that these statements characterize Schaecher as a lawbreaker, one without integrity, or one with disregard for the law, or imply that Happy Tails was in violation of the law, and that defendant made these statements with the intent to defame Schaecher and Happy Tails. Two additional emails state that "It would appear that Mrs. Schaecher was not totally truthful," and "I firmly believe that Gina is lying and manipulating facts," respectively. Plaintiffs allege that these statements impugn Schaecher's honesty and harm the reputation of Happy Tails.  Finally, one email includes a remark by Bouffault regarding Schaecher's sister Mary, who was to serve as the resident manager at the kennel.  The email states that "Mary had owned a property . . . with her boyfriend – they have now split . . . but [she] appears to be having difficulties in paying the mortgage . . . foreclosure could be a possibility."  Plaintiffs allege that the statement defamed Schaecher and Happy Tails.  The individual statements are discussed in more detail in Part II.A., infra.

Happy Tails also alleges that because of "false, reckless, defamatory and/or misleading statements to the press, Clarke County government officials, the planning commission and members of the Board of Supervisors," Happy Tails incurred additional costs due to delay in review of the special use

3

permit and in order to refute and remedy Bouffault's statements. Additionally, "[u]pon information and belief, [defendant] engage[ed] third parties to threaten and harass persons who openly supported [Happy Tails'] proposed use for the Property causing the Sellers' reservations in continuing [Happy Tails'] Sales Contract." Happy Tails pled that Bouffault's conduct delayed and increased costs such that the Sales Contract became cost prohibitive and Happy Tails was forced to terminate. An attached exhibit reflected a signed Sales Contract that indicated settlement on the sale of the property was to occur on May 30, 2014, one day after the amended complaint was filed. Nothing in the attached exhibit indicated that the contract had been terminated.

Bouffault again demurred to the amended complaint. The circuit court ruled that the statements were not defamatory; that the statements and actions complained of were "committed incident to the performance of a legislative function of the Defendant as a member of the Clarke County Planning Commission; therefore, they are protected by legislative immunity"; and that the allegations did not set forth a claim for tortious interference with contract. The circuit court therefore sustained the demurrer on all counts. We granted this appeal.

4

## II. DISCUSSION

We review the circuit court's ruling on a demurrer de novo. Schilling v. Schilling, 280 Va. 146, 148, 695 S.E.2d 181, 183 (2010). "A demurrer accepts as true all facts properly pled, as well as reasonable inferences from those facts." Steward v. Holland Family Props., LLC, 284 Va. 282, 286, 726 S.E.2d 251, 253 (2012).

## A. Defamation

Virginia makes no distinction between actions for libel and slander. Shupe v. Rose's Stores, Inc., 213 Va. 374, 375-76, 192 S.E.2d 766, 767 (1972). In Virginia, when a plaintiff alleges defamation by publication, the elements are "(1) publication of (2) an actionable statement with (3) the requisite intent." Tharpe v. Saunders, 285 Va. 476, 480, 737 S.E.2d 890, 892 (2013) (internal quotation marks omitted). In the present case the elements of publication and intent are sufficiently pled on the face of the pleading. This appeal focuses on whether the statements pled are actionable.

An "actionable" statement is both false and defamatory. Id. at 481, 737 S.E.2d at 892. Defamatory words are those "tend[ing] so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement (Second) of Torts § 559; see Chapin v. Knight-Ridder, Inc., 993 F.2d 1087,

5

1092 (4th Cir. 1993)(applying Virginia law).  A false statement must have the requisite defamatory "sting" to one's reputation. See Air Wis. Airlines Corp. v. Hoeper, ___ U.S.___, ___, 134 S.Ct. 852, 866 (2014) (focusing on "the substance, the gist, the sting" of an allegedly defamatory statement); Curtis Pub. Co. v. Butts, 388 U.S. 130, 138 (1967)(referring to the defamatory implication as the "sting of the libel").

Characterizing the level of harm to one's reputation required for defamatory "sting," we have stated that defamatory language "tends to injure one's reputation in the common estimation of mankind, to throw contumely, shame, or disgrace upon him, or which tends to hold him up to scorn, ridicule, or contempt, or which is calculated to render him infamous, odious, or ridiculous."  Moss v. Harwood, 102 Va. 386, 392, 46 S.E. 385 (1904); see Adams v. Lawson, 58 Va. (17 Gratt.) 250, 255-56 (1867) ("It is sufficient if the language tends to injure the reputation of the party, to throw contumely, or to reflect shame and disgrace upon him, or to hold him up as an object of scorn, ridicule or contempt."); see also Moseley v. Moss, 47 Va. (6 Gratt.) 534, 538 (1850) (actionable defamation "tend[s] to make the party subject to disgrace, ridicule, or contempt").  Each of these descriptions connotes the requisite defamatory "sting," while "language that is insulting, offensive, or otherwise inappropriate, but constitutes no more

6

than 'rhetorical hyperbole'" is not defamatory. <u>Yeagle v. Collegiate Times</u>, 255 Va. 293, 296, 497 S.E.2d 136, 137 (1998).

We recently had occasion to restate the historical elements of a common law defamation pleading:

> A common law complaint for libel or slander historically included three elements:  the inducement, an explanation of the facts demonstrating that the allegedly defamatory statement is actionable; the colloquium, an explanation of how the allegedly defamatory statement refers to the plaintiff, if he is not explicitly named; and the innuendo, an explanation of the allegedly defamatory meaning of the statement, if it is not apparent on its face.

<u>Webb v. Virginian-Pilot Media Cos.</u>, 287 Va. 84, 88, 752 S.E.2d 808, 811 (2014) (citing Black's Law Dictionary 300, 845, 861 (9th ed. 2009)).  In the case at bar, the question before the Court is whether the statements are either defamatory on their face or contain sufficient innuendo to imply defamatory meaning; we must also consider whether the statements constitute protected First Amendment speech.

In evaluating whether language is actionable, we take all inferences in favor of the plaintiff, but such inferences cannot rise above the language of the documents or statements themselves:

> In determining whether the words and statements complained of . . . are reasonably capable of the meaning ascribed to them by innuendo, every fair inference that may be drawn from the pleadings must be resolved in the plaintiff's favor.  However, the meaning of the alleged defamatory language can not, by innuendo, be extended beyond its ordinary and common

7

acceptation. The province of the innuendo is to show how the words used are defamatory, and how they relate to the plaintiff, but it can not introduce new matter, nor extend the meaning of the words used, or make that certain which is in fact uncertain.

Id. at 89-90, 752 S.E.2d at 811 (quoting Carwile v. Richmond Newspapers, Inc., 196 Va. 1, 8, 82 S.E.2d 588, 592 (1954)).

To determine whether a statement can be reasonably understood as stating or implying actual facts, whether those statements are verifiable, and whether they are reasonably capable of defamatory meaning, we must examine them in context:

Although varying circumstances often make it difficult to determine whether particular language is defamatory, it is a general rule that allegedly defamatory words are to be taken in their plain and natural meaning and to be understood by courts and juries as other people would understand them, and according to the sense in which they appear to have been used.

Carwile, 196 Va. at 7, 82 S.E.2d at 591-92; accord Farah v. Esquire Magazine, 736 F.3d 528, 535 (D.C. Cir. 2013) ("[T]he publication must be taken as a whole, and in the sense in which it would be understood by the readers to whom it was addressed." (internal quotation marks and citations omitted.)).

With these principles in mind, a court must decide as a threshold matter of law whether a statement is reasonably capable of defamatory meaning before allowing the matter to be

8

presented to a finder of fact.  Perk v. Vector Res. Group,
Ltd., 253 Va. 310, 316-17, 485 S.E.2d 140, 143-44 (1997).  To
perform this gatekeeping function, we turn to the statements at
issue today.

> 1.  Statements Pertaining to Prospective Violations of
>     Easements, Covenants, or Ordinances

Plaintiffs' amended complaint includes as exhibits a
number of emails in which Bouffault expresses concern that
plaintiffs' plans for the property do not comply with
easements, covenants, or ordinances.  Plaintiffs allege that
these emails are defamatory.  We disagree.

> a.  Contents of the Emails

The first email (Exhibit B) indicates that Bouffault is
"attaching a[n applicable] Conservation Easement document,
where you will see on the 5th page the highlighted paragraph
that would appear to prohibit a commercial dog kennel on the
easement."  Plaintiffs allege that Bouffault knew or should
have known that the conservation easement authority had
communicated its approval of the use detailed in the special
use permit application.  They allege that her statement was
false, misleading, tending to indicate that Schaecher was a
"law breaker or a person of disregard for . . . legal
obligations," and intended to harm the reputation of Happy
Tails.

9

Another disputed email (Exhibit D) pertains to property covenant restrictions in the deed regarding dwelling size: Bouffault states that the plan for the property does not meet the requirements.

Two emails from Bouffault (Exhibits E and F) pertain to county ordinances regarding single-family detached dwellings on residential properties. Bouffault states that the caretaker's residence does not meet the ordinance requirements, and further states her understanding that the Schaecher family will not be immediately moving to the property, which Bouffault asserts changes the nature of the application.

Finally, an email from Bouffault to Schaecher, copied to Planning Commission members (Exhibit H), raises Bouffault's concerns over breaches in private covenants.

b. Requisite Defamatory "Sting"

The potential violation of an easement, referenced in Exhibit B, does not as a general principle carry the "sting" of a reprehensible crime. The mere implication that one might be in violation of an easement, absent more – such as inflammatory language or context to suggest that the statement causes particular harm to one's reputation – does not rise to the level of defamation. It does not so "harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him,"

10

Restatement (Second) of Torts § 559, such as by making the plaintiff appear odious, infamous, or ridiculous, or subjecting her to contempt, scorn, shame, or disgrace.

Similarly, the potential violation of covenant restrictions, referenced in Exhibits D and H, does not alone carry the requisite defamatory "sting." Covenant restrictions are contractual in nature, Black's Law Dictionary 443 (10th ed. 2014), and the breach of a contract does not necessarily bring with it defamatory connotation. We do not hold that accusations of violations of covenants or easements are never defamatory as a matter of law, merely that they are not inherently defamatory. Based on the neutral language of these emails and their context, even construing them in the light most supportive of the plaintiff, there is nothing to aggravate the plain language of the emails to suggest they are defamatory.

As to Exhibits E and F, the legislative nature of an ordinance may carry a law-breaking implication above that inherent in a charge of breach of a covenant or easement. However, plaintiffs face the same essential challenges: the potential violation of a county ordinance by a proposed dwelling plan does not in and of itself rise to the level of defamation. An accusation of ordinance violations may in some contexts carry defamatory "sting," but the ordinance at issue

here pertains to the requirements of a free standing dwelling unit.  It is thus not apparent on the face of the document how this violation would render the plaintiffs odious, infamous, or ridiculous, or otherwise subject them to contempt, shame, scorn, or disgrace.

The face of these emails does not reasonably convey defamatory "sting."  We thus turn to the innuendo articulated in the pleading, explaining the allegedly defamatory meaning, to consider whether the pleading guides us to a defamatory implication in the words that is not immediately apparent. Webb, 287 at 88, 752 S.E.2d at 811.

c.  Alleged Innuendo

As previously addressed, innuendo may not extend beyond the meaning of the words in the statement.  Id. at 90, 752 S.E.2d at 811.  Upon review of the amended complaint, we find that the language of the emails does not support the innuendos pled by Schaecher and Happy Tails.

As to the easement referenced in Exhibit B, Schaecher alleges that the intent of the email was to characterize her as a "law breaker" or "a person of disregard for the legal obligations pertaining to the Property."  The statement that one's proposed project is apparently prohibited by an easement does not, by innuendo, rise to the level that Schaecher proposes.  First, while an easement is a legal obligation

12

imposed upon the owners of the property, breach of an easement does not have the stigma of "law breaker" that Schaecher pleads. Second, the content of the email was entirely descriptive of the current status of the plan and contained no predictions regarding the future. Bouffault professed no knowledge as to whether Schaecher would go forward with the project as planned if it were in fact in violation of the easement discussed. As is obvious from the context of the case, the project was not built at the time of the email, but rather was in the process of obtaining the required variances and engaging in other negotiations. As of the time of this email, there clearly was no kennel operating on the property, so Schaecher and Happy Tails could not yet have been in violation of any easement. Consequently, there was no actionable injurious factual assertion made as a "reasonable implication" of the published statement. Carwile, 196 Va. at 9, 82 S.E.2d at 592. Thus, the ordinary and common import of the language of the email does not convey that she is a "law breaker" or "a person of disregard for the legal obligations pertaining to the Property," as Schaecher alleges.[3]

---

[3] The amended complaint does not plead with specificity in what manner the purported breach of easement harms the reputation of Happy Tails. We are left to conclude that Happy Tails is generally asking the Court to infer that the community would find a business without regard for easements to be odious, infamous, ridiculous, contemptible, or subject to

13

For the same reasons, the emails addressing private restrictive covenants in Exhibits D and H fall short of the innuendo alleged in the complaint, which avers that the reader would infer that plaintiffs were "breaking the law and/or otherwise disregarding legal obligations" or "in violation of private legal obligations."  First, a private restrictive covenant is contractual in nature, and plaintiffs would not be in violation of "law" if they were to breach such a covenant. Second, because the email merely describes the state of the current plan — a structure not yet built — Bouffault is likewise not accusing plaintiffs of actively violating covenant restrictions.  The email expresses no position as to the future plans of Schaecher or Happy Tails:  a reader could equally or more reasonably infer that the proposed plans simply needed to be amended.  The language in the email itself does not support the innuendo that plaintiffs allege.

The plaintiffs argue that the innuendo present in the residential ordinance emails (Exhibits E and F) suggests that plaintiffs are "in violation of the law," harming the reputation of Schaecher and Happy Tails.  The language of the emails once again does not support plaintiffs' argument.  The

disgrace, scorn, or shame, or that the business is tarnished by such aspersions cast upon Schaecher, its owner.  In either case, for the reasons discussed in relation to Schaecher, the statement is not defamatory as to Happy Tails.

14

emails reflect only a belief on the part of Bouffault that the current plans for the kennel violate the requirements for a free standing residential dwelling. Proposing a plan for a dwelling that does not comply with residential dwelling requirements is not a violation of a law, nor does neutral language stating that a plan does not align with current ordinances create "a reasonable implication" from which to infer one would violate the law. Carwile, 196 Va. at 9, 82 S.E.2d at 592. There is nothing in the statements to indicate that plaintiffs plan on violating the law.

Neither aspersions reasonably apparent from the face of these emails or innuendo reasonably apparent from their context provide sufficient defamatory "sting" to make them actionable against the defendant on behalf of either Schaecher or Tails.

2.    Statements to The Winchester Star

Plaintiffs allege that Bouffault made the following statements regarding the special use permit application in The Winchester Star: (1) "Conservation easements usually allow only agricultural enterprises"; (2) "A dog kennel is not an agricultural enterprise"; and (3) "40 dogs barking would probably constitute noise pollution."

The first two statements allegedly made by Bouffault are not defamatory for the reasons discussed in Part II.A.1., supra: they lack the requisite defamatory "sting." Assuming

15

for the sake of argument that the third statement contained defamatory "sting," it is not actionable, as it cannot be proven false.  See Cashion v. Smith, 286 Va. 327, 336, 749 S.E.2d 526, 531 (2013); see also Milkovich v. Lorain Journal Co., 497 U.S. 1, 19-20 (1990).

For a statement to be actionable, it must "have a provably false factual connotation and thus [be] capable of being proven true or false."  Cashion, 286 Va. at 336, 749 S.E.2d at 531 (internal quotation marks omitted); accord Potomac Valve & Fitting, Inc. v. Crawford Fitting Co., 829 F.2d 1280, 1288 (4th Cir. 1987) ("[T]he verifiability of the statement in question [is] a minimum threshold issue.  If the defendant's words cannot be described as either true or false, they are not actionable.").  The term "noise pollution" is not identified by the plaintiffs as a quantifiable term in Clarke County.  The pleading references no standard by which one could assess whether the statement is in fact false.  The statements allegedly made to the Winchester Star are thus not actionable as to either plaintiff.

3.   Statement Regarding "Sister Mary"

One email (Exhibit G) provides a highly detailed report of Bouffault's trip to a "get together" that was occurring on the property "for the adjoining neighbors, to discuss and show them where the kennels were to be."  Bouffault indicates that

16

Schaecher's sister Mary is to be the on-site caretaker and adds the following parenthetical: "(Note: Sister Mary had owned a property in Bluemont with her boyfriend – they have now split, and she has the property, but appears to be having difficulties in paying the mortgage, resulting in mortgage modifications, etc. – foreclosure could be a possibility.)"

Here, we conclude that neither Gina Schaecher nor Happy Tails could bring a claim for defamation based upon this statement, as it is not "of and concerning" either party. Gazette, Inc. v. Harris, 229 Va. 1, 37, 325 S.E.2d 713, 738 (1985). A pleading for defamation must allege or otherwise make apparent on the face of the pleading that the alleged defamatory statements are "of and concerning" the plaintiff. Dean v. Dearing, 263 Va. 485, 488, 561 S.E.2d 686, 688 (2002).

While in some cases a business may bring a defamation action on its own behalf when one of its employees is allegedly defamed, there must be a sufficient nexus between the alleged defamatory nature of the statement and the business:

> Authorities dealing with the subject generally hold that an imputation defamatory to stockholders, officers, or employees of a corporation does not constitute defamation of the corporation itself in the absence of an allegation of special damages. Prosser, Law of Torts § 106 (3d ed. 1964); Restatement of Torts § 561(1) cmt. a; 53 C.J.S. Libel and Slander § 34, at 83.

. . . .

17

Life Printing & Publishing Co. v. Field, 324 Ill.App. 254, 58 N.E.2d 307 (1944), involved a newspaper article implying that the publisher of the corporate plaintiff was one of the founders of an anti-Semitic organization.  In holding that the publication was not libelous per se as to such corporate plaintiff, the Court said the following at page 310:  . . . "Words spoken or written of a stockholder or officer give no right of action to the corporation unless spoken or written in direct relation to the trade or business of the corporation.  If they relate solely to the stockholder, officer, or employee in his private or personal capacity, only the individual can complain."

Novick v. Hearst Corp., 278 F.Supp. 277, 279-80 (D. Md. 1968).

Bouffault's statement does not impugn Mary's ability as a caretaker of dogs, and plaintiffs have not alleged any other sufficient nexus that Mary's living situation has with the business.  While the above excerpt does not foreclose the possibility of special damages, Happy Tails did not plead special damages.  Where a plaintiff does not prevail on a claim of defamation per se, and has not alleged or stated proof of special damages, the plaintiff may not proceed.  Weaver v. Beneficial Finance Co., 200 Va. 572, 579, 106 S.E.2d 620, 625 (1959).

No Virginia precedent would support the proposition that Gina Schaecher could state a defamation claim "of and concerning" her, as owner of her business, based on a statement made against one of her employees but unrelated to the work. Corporate owners generally cannot personally pursue an action for defamation of their corporation, because the corporate

18

entity is "itself the only person entitled to recover for injuries to its business, profits or property." Landmark Commc'ns, Inc. v. Macione, 230 Va. 137, 140, 334 S.E.2d 587, 589 (1985). For Gina Schaecher to proceed on her own behalf, a sufficient nexus must be pled to show how the allegedly defamatory statement degrades the reputation of, and is "of and concerning," Gina Schaecher. Such a nexus is not alleged in the pleadings of this case.

4.   Emails Impugning Honesty

Plaintiffs raise two statements that pertain to the honesty of Schaecher in Happy Tails' special use permit application proceedings. The first truth-related email (Exhibit C) relays information pertaining to prior deferred kennel applications from Loudoun County, provides a link to 3 Dog Farm's website, and concludes based on the relayed information that "It would appear that Mrs. Schaecher was not totally truthful. . . ." in stating that the family did not currently have a commercial kennel. The final email (Exhibit I) describes to Brandon Stidham and Jesse Russell apparent discrepancies between the Planning Commission's initial understanding of the use of Schaecher's property and Schaecher's current characterization, states that Schaecher has twice stated that Russell is lying, encourages that all communication with her be in writing only, and states "I firmly

believe that Gina is lying and manipulating facts to her benefit. . . ."

    a.  <u>Requisite Defamatory "Sting"</u>

As with the previous statements, aspersions related to honesty are subject to an evaluation as to the requisite level of "sting." Libelous aspersions impugning honesty have long been accepted in the Commonwealth as potentially defamatory in nature. <u>See</u> <u>Adams</u>, 58 Va. at 255-57 (holding that a written charge advising another to "quit lying" is actionable because it implies that he has been lying, and tends to injure the reputation of the party and to hold him as an object of contempt). The Supreme Court of the United States has also explained that, in the proper context, an accusation that one is a liar is grounds for defamation. <u>See</u> <u>Milkovich</u>, 497 U.S. at 20-23 & n.7. As with all evaluations of defamatory statements, however, context is of the utmost importance. <u>See</u> <u>Carwile</u>, 196 Va. at 7-9, 82 S.E.2d at 591-92; <u>see also</u> <u>Farah</u>, 736 F.3d at 535. Reputation must be affected to a magnitude sufficient to render one odious, infamous, or ridiculous, or subject to disgrace, shame, scorn, or contempt.

The context of the emails assists us in analyzing these two statements. In the first instance, Bouffault shares information with Planning Commission members concerning one question Schaecher had been asked about whether she has a

20

commercial kennel operation. Schaecher apparently answered that she did not have a commercial kennel, but had six dogs of her own. Bouffault shared two prior kennel applications from Loudoun County that had been "deferred," as well as a link to a website for 3 Dog Farm, which Bouffault stated represented a commercial kennel offering. She then concludes, "It would appear that Mrs. Schaecher was not totally truthful . . . ."

Bouffault's email presents some evidence that appears to, but does not conclusively, contradict Schaecher's prior statement.[4] Bouffault's concluding sentence is in the nature of a summary that hedges her prior statement (". . . not <u>totally</u> truthful" (emphasis added)). While this characterization is unpleasant, "[m]erely offensive or unpleasant statements are not defamatory." <u>Chapin</u>, 993 F.2d at 1092. It is married to a single and relatively benign particular fact regarding whether Schaecher was operating a commercial kennel, and so does not necessarily impugn Schaecher's character as a whole. It does not meet the threshold for defamatory "sting" to engender disgrace, shame, scorn, or contempt, or to render one odious, infamous, or ridiculous.

On the other hand, the statement that "I firmly believe that Gina is lying and manipulating facts to her benefit" does

[4] The Loudoun County applications were from 2008 and 2010, respectively.

not hedge.  The statement is in the context of an email that alleges repetitive lying by Schaecher to the Planning Commission, states that all dealings must be in writing ("EVERYTHING with her in writing only"), and implies that Bouffault believes Schaecher cannot be trusted ("TRUST NO ONE").  The face of the email alleges that, in her dealings with the Planning Commission, Schaecher was lying and manipulative.  As such, this statement can reasonably be understood as an aspersion cast on Schaecher's reputation and character:  the perception that one is deliberately lying and manipulating facts throughout a governmental process is sufficiently damaging to one's reputation so as to deter others from associating with her and render her contemptible in the estimation of the community.  Thus, this statement has the requisite defamatory "sting," but that does not end our inquiry.

b.  Protected Fact-Based Opinion

The above statement is also couched in language suggesting that it may be an opinion.  As we have previously noted:

> Causes of action for defamation have their basis in state common law but are subject to principles of freedom of speech arising under the First Amendment to the United States Constitution and Article I, Section 12 of the Constitution of Virginia.  The United States Supreme Court has identified constitutional limits on the type of speech that may be the subject of common law defamation actions.  Thus, speech which does not contain a provably false factual connotation, or

22

statements which cannot reasonably be interpreted as stating actual facts about a person cannot form the basis of a common law defamation action.

Yeagle, 255 Va. at 295, 497 S.E.2d at 137 (footnote omitted) (citing Milkovich, 497 U.S. at 16-17, 20).

Whether an alleged defamatory statement contains a provably false factual connotation or is a "pure expression[] of opinion" is a question of law that we examine de novo. Tharpe, 285 Va. at 481-82, 737 S.E.2d at 893. In so doing, "we do not determine whether the alleged defamatory statement is true or false, but whether it is capable of being proved true or false." Id. at 482, 737 S.E.2d at 893.

As a preliminary matter, we have long stated that "it is not necessary to make a writing libelous that the imputations should be made in the form of positive assertion." Adams, 58 Va. at 256. Therefore, "'[s]imply couching . . . statements in terms of opinion does not dispel [factual] implications.'" Raytheon Tech. Servs. Co. v. Hyland, 273 Va. 292, 303, 641 S.E.2d 84, 91 (2007) (quoting Milkovich, 497 U.S. at 19). Consequently, the preamble "I firmly believe" does not provide Bouffault with shelter if the remainder of her statement contains a provably false connotation.

The standard previously articulated by this Court is whether a statement can be "reasonably be understood . . . to convey a false representation of fact." Yeagle, 255 Va. at

23

296, 497 S.E.2d at 137 (quoting Crawford v. United Steel Workers, AFL-CIO, 230 Va. 217, 234-35, 335 S.E.2d 828, 839 (1985)).  Accordingly, we have held that clear "rhetorical hyperbole" is not defamatory.  Yeagle, 255 Va. at 297, 497 S.E.2d at 138.  Consistent with this approach, in Chaves v. Johnson, 230 Va. 112, 118-19, 335 S.E.2d 97, 101 (1985), this Court held that statements that plaintiff's fees were "excessive" and that he was "inexperienced" were not defamatory, as the "relative nature of such opinions is obvious to anyone who hears them."

In Chaves and Yeagle, an average person could identify the language used as being relative or hyperbolic statements of opinion.  The same cannot be said for an accusation of lying and manipulating facts:  such statements can imply underlying facts, and "opinions may be actionable where they 'imply an assertion' of objective fact."  Raytheon, 273 Va. at 303 (quoting Milkovich, 497 U.S. at 21).

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth.  Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact.

Milkovich, 497 U.S. at 18-19.  Thus, we consider whether the facts underlying Bouffault's statement might be incorrect or

24

incomplete, or whether her assessment of them is erroneous so as to imply a false assertion of fact. In doing so, we must continue to consider the context and the audience.

The accusation that Schaecher was lying, which Schaecher alleges was false, arose in a longer email from Bouffault to two Planning Commission members:

> What you sent was in the packet of September. So, are you telling me that there is NO DESCRIPTION detailing what is going to be done contained as an integral part of the application? And that everything that Jesse outlined in the Case Summary is from VERBAL conversations with the applicant? You have nothing in writing? In her letter of October 3d, Gina states on the second page that "As a point of clarification, we do note that the description of our project on the agenda remains inconsistent with the purpose and nature of our project." And then goes on with a blurb very different from what was originally placed in the Case Summary.
>
> Our application documents are in SERIOUS need of revision. This is the second time that Gina has effectively stated that you, Jesse, are not stating facts correctly (i.e. you are lying): you stated CLEARLY to the commissioners at our Sept. briefing meeting that Gina and her family were going to move to Clarke and live on the property, then Gina said no, not true, when questioned at the Sept. Friday meeting. She now says that what has been stated is "inconsistent" with "the purpose and nature of our project."

Bouffault's statement that she "firmly believe[s] that Gina is lying and manipulating facts to her benefit" immediately follows.

It is particularly noteworthy that Schaecher did not plead that the factual allegations in the above email were incomplete

25

or generally false – in other words, Shaecher did not deny that there were inconsistencies between her understanding of events and that of the Planning Commission – merely that it was not true that she <u>lied</u>. There are several possible explanations for a discrepancy between Schaecher's current characterization of the project and the version on record with the Planning Commission or in Jesse Russell's memory: mistake, miscommunication, deliberate lying, or a genuine evolution of external facts that produced a change of circumstances. The potential defamation arises only from the implication that Schaecher lied, as opposed to the alternatives, the implications of which lack defamatory "sting." Thus, Schaecher does not contend that the facts underlying the accusation are incomplete or untrue, but rather that the conclusion that she lied is incorrect and thus implies a defamatory fact.

The email appears to fully disclose the basis of Bouffault's rationale. <u>See</u> <u>Biospherics, Inc. v. Forbes, Inc.</u>, 151 F.3d 180, 185 (4th Cir. 1998) (opinions fully disclosing their factual bases constitute a subjective view and are not actionable); <u>Phantom Touring, Inc. v. Affiliated Publications</u>, 953 F.2d 724, 730 (1st Cir. 1992) (where "all sides of the issue, as well as the rationale for [the speaker's] view, were exposed, the assertion of deceit reasonably could be understood only as [the speaker's] personal conclusion about the

information presented"); see also Standing Comm. on Discipline of the United States Dist. Court v. Yagman, 55 F.3d 1430, 1439 (9th Cir. 1995) ("A statement of opinions on fully disclosed facts can be punished only if the stated facts are themselves false and demeaning."). As Schaecher has not pled that the stated facts are themselves false and defamatory, in order for Bouffault's statements to be defamatory, it would have to be reasonable for Russell or Stidham to perceive that Bouffault had an implied factual basis for her accusation that Schaecher was lying of which they were unaware.

However, the two individuals to whom Bouffault sent the email, Russell and Stidham, possessed a high degree of familiarity with the situation. Given that Russell was the one allegedly lied about, and Stidham was the Director of the Planning Commission, the two hold an equal or higher degree of knowledge of the situation than Bouffault. In exercising our gatekeeper function, we must therefore conclude that a reasonable person in Russell or Stidham's positions would have perceived the accusation as a pure opinion on the part of Bouffault based upon her subjective understanding of the underlying scenario and not upon an implied factual predicate of which they were unaware.

Thus, because of Russell and Stidham's knowledge of the factual basis for Bouffault's statement, in the absence of a

27

claim that the stated underlying facts themselves were false and defamatory, and because the context of the email and the positions of Russell and Stidham would allow them to reasonably conclude that Bouffault's statement was purely her own subjective analysis, the statement is protected by the First Amendment and is not actionable.

As we have concluded that none of the statements are actionable, we do not reach the assignment of error pertaining to legislative immunity.

B.    Tortious Interference with Contractual Relations

The circuit court concluded that Happy Tails failed to plead a cause of action for tortious interference with contractual relations.  We agree.

In Virginia, the elements of a claim for tortious interference with contractual relations are typically recited as (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. Chaves, 230 Va. at 120, 335 S.E.2d at 102.  At issue today is whether Happy Tails properly pled the third element.

28

Bouffault argues that this third element requires direct competitive interference with a contract, and that as she was not a competitor for the land purchase contract involved in this case, she cannot be liable for tortious interference with that contract under applicable Virginia precedent.  She argues that, as a neighbor and Planning Commission member, she was far removed from the contractual negotiations.  Bouffault also argues that any termination of contract on the part of Happy Tails was voluntary, not "caus[ed]" or "induc[ed]."

In essence, the parties agree that existing Virginia case law explicitly covers the scenario addressed in the Restatement (Second) of Torts § 766, "Intentional Interference with Performance of Contract by Third Person."  Happy Tails argues that our precedent in Duggin v. Adams, 234 Va. 221, 360 S.E.2d 832 (1987), stands for the proposition that a plaintiff who alleged he was deliberately misled into giving up contractual rights stated a claim for tortious interference, and in doing so implicitly endorses the doctrine set forth in the Restatement (Second) of Torts § 766A, "Intentional Interference with Another's Performance of His Own Contract."  The Reporters Notes to § 766A indicate that while the section is new, it was "tacitly presented" in § 766.  Two areas in which § 766A is more explicitly broad than the former section is that it allows for more indirect interference on behalf of the defendant and

29

allows for recovery of damages against a defendant who makes a contract more burdensome or expensive.

We do not reach this issue today. Even under the broader language of § 766A advanced by Happy Tails, its pleading fails. Happy Tails attaches to its pleading multiple iterations of the contract for the sale of real property. It does not appear to have become more expensive: the percentage for a deposit and total cost remain the same. Although Happy Tails alleges that it was terminated, the last iteration of the contract was signed and indicates that settlement would occur the day after the amended complaint was filed. In short, nothing in the contract indicates that it has been terminated. A court considering a demurrer may ignore a party's factual allegations contradicted by the terms of authentic, unambiguous documents that properly are part of the pleadings. Ward's Equipment, Inc. v. New Holland North America, Inc., 254 Va. 379, 381-84, 493 S.E.2d 516, 518-520 (1997).

Additionally, the specific allegation advanced by Happy Tails is not that Bouffault increased the cost of her contract, leading to its termination, but rather that Bouffault's actions required hiring "engineers, consultants, scientists, appraisers and/or additional services . . . to refute and address Defendant's defamatory statements." Happy Tails does not allege that the contract became any more expensive or

30

burdensome, and so does not meet the pleading requirements for tortious interference with contractual relations.  We therefore agree with the circuit court.

III.  CONCLUSION

For the aforementioned reasons, we will affirm the judgment of the circuit court.

<u>Affirmed.</u>